## MUNICIPAL REVENUE SERVICE, INC., Plaintiff,

v.

## XSPAND, INC. and Bear Stearns & Co., Inc., Defendants.

### No. 4:05–cv–671.

United States District Court, M.D. Pennsylvania.

March 31, 2010.

John G. Dean, Elliott Greenleaf & Sied-zikowski, P.C., Scranton, PA, John M. Elliott, John P. Elliott, Mark J. Schwemler, Elliott, Greenleaf & Siedzikowski PC, Blue Bell, PA, Bruce W. Kauffman, Elliott Greenleaf, Philadelphia, PA, for Plaintiff.

C. Grainger Bowman, Kirkpatrick & Lockhart Preston Gates Ellis LLP, Harrisburg, PA, David R. Fine, K & L Gates LLP, Harrisburg, PA, Craig E. Ziegler, Montgomery, McCracken, Walker & Rhoads, Thomas W. Dymek, Stradley Ronon Stevens & Young, LLP, Philadelphia, PA, James G. Mann, Rodney A. Corey, PA House of Representatives, Harrisburg, PA, Philip W. Newcomer, Norristown, PA, Robert L. Knupp, Knupp, Kodak & Imblum, P.C., Harrisburg, PA, for Defendants.

## MEMORANDUM and ORDER

JOHN E. JONES III, District Judge.

Currently pending before the Court are three motions for summary judgment. The first was filed by Defendant Xspand, Inc. ("Xspand"). (Doc. 445). The second is a partial motion for summary judgment filed by Plaintiff Municipal Revenue Service, Inc. ("Plaintiff" or "MRS"). (Doc. 449). The third was filed by Defendant Bear Stearns & Co., Inc. ("Bear"). (Doc. 451). For the reasons that follow, all three motions shall be granted in part and denied in part.

## I. PROCEDURAL HISTORY

Plaintiff initiated the instant action on April 1, 2005 by filing a five count complaint against Xspand containing the following claims: (i) violation of the Lanham Act, 15 U.S.C. § 1051 et seq.; (ii) unfair competition; (iii) defamation; (iv) commercial disparagement; and (v) tortious interference with prospective contractual relations. (See Doc. 1). On October 17, 2005, Plaintiff filed an amended complaint that added Bear as a Defendant and asserted against it all five of the above-referenced claims. (See Doc. 69). On March 4, 2009, Xspand filed its motion for summary judgment, (Doc. 445) (the "Xspand Motion"), MRS filed its partial summary judgment motion, (Doc. 449) (the "MRS Motion"), and Bear filed its summary judgment motion, (Doc. 451) (the "Bear Motion"). Since all three motions have been fully briefed, they are ripe for disposition.

## II. STANDARD OF REVIEW

Summary judgment is appropriate if the record establishes "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The movant meets this burden by pointing to an absence of evidence supporting an essential element as to which the non-moving party will bear the burden of proof at trial. Id. at 325, 106 S.Ct. 2548. Once the moving party meets its burden, the burden then shifts to the non-moving party to show that there is a genuine issue for trial. Fed.R.Civ.P. 56(e)(2). An issue is "genuine" only if there is a sufficient evidentiary basis for a reasonable jury to find for the non-moving party, and a factual dispute is "material" only if it might affect the outcome of the action under the governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In opposing summary judgment, the non-moving party "may not rely merely on allegations of denials in its own pleadings; rather, its response must ... set out specific facts showing a genuine issue

for trial." Fed.R.Civ.P. 56(e)(2). The non-moving party "cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial." *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir.2000). Arguments made in briefs "are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion." *Jersey Cent. Power & Light Co. v. Twp. of Lacey*, 772 F.2d 1103, 1109–10 (3d Cir.1985). However, the facts and all reasonable inferences drawn therefrom must be viewed in the light most favorable to the nonmoving party. *P.N. v. Clementon Bd. of Educ.*, 442 F.3d 848, 852 (3d Cir.2006).

Summary judgment should not be granted when there is a disagreement about the facts or the proper inferences that a fact finder could draw from them. *Peterson v. Lehigh Valley Dist. Council*, 676 F.2d 81, 84 (3d Cir.1982). Still, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; there must be a *genuine* issue of *material* fact to preclude summary judgment." *Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505.

## III. FACTUAL BACKGROUND

The parties and the Court are all too intimately familiar with the facts undergirding this case. Therefore, for the purposes of disposing the various motions, we shall simply make a generalized statement of fact.[1] We shall refer to or address specific facts in our discussion only as they become necessary for the resolution of the pending motions.

At all times pertinent to the instant litigation, MRS was in the business of purchasing delinquent tax liens from municipalities and school districts in the Commonwealth of Pennsylvania. (*See* Compl. ¶ 7). At all relevant times, Xspand was a competitor of MRS in Pennsylvania. (*Id.* ¶ 10). MRS alleges that Xspand has used false and misleading advertising to unfairly compete against it. (*Id.* ¶ 17). Specifically, MRS claims that Xspand has disseminated misinformation regarding the nature of its services, in that Xspand has, *inter alia*, informed potential MRS customers that MRS-facilitated transactions produced debt, not revenue, for the taxing entity. (*See id.* ¶¶ 18–49). MRS alleges that Xspand's conduct has caused it to lose a substantial part of its business in the form of both current and prospective customers. (*See id.* ¶¶ 24–25, 32, 43). Plaintiff contends that Bear may be held liable for Xspand's conduct because a joint venture or agency relationship exists between Bear and Xspand, and because the former endorses the conduct of the latter. (*See id.* ¶¶ 10–12, 27). These allegations form the basic foundation of the five causes of action asserted by MRS against Xspand and Bear.

## IV. DISCUSSION

As stated, all three parties to the instant litigation have filed summary judgment motions. We shall address these motions in turn, beginning with the motions of Defendants Xspand and Bear and concluding with the MRS Motion.

### A. The Xspand Motion

The Xspand Motion lodges numerous grounds for dismissal of Plaintiff's claims, including global infirmities afflicting the complaint as a whole and discrete infirmities associated with each count specifically.

---

1. Since our factual recitation is merely a broad overview of the basis for the instant litigation, it is generally taken from Plaintiff's amended complaint.

We shall address these in turn, beginning with the former.

### i. Global Infirmities

The first global defect involves the *Noerr Pennington* Doctrine, which Xspand asserts bars each count of the complaint. This doctrine, which emanated from the cases *Eastern R.R. Presidents Conference v. Noerr Motor Freight Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), and *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), initially immunized private parties against liability for antitrust violations stemming from valid petitioning activities. *See A.D. Bedell Wholesale Co., Inc. v. Philip Morris Inc.*, 263 F.3d 239, 251 (3d Cir.2001). However, some courts have held that its application extends beyond the realm of antitrust law, *see, e.g., Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119, 128–29 (3d Cir.1999) (construing New Jersey law and extending *Noerr Pennington* immunity to state tort claims); *Brownsville Golden Age Nursing Home, Inc. v. Wells*, 839 F.2d 155 (3d Cir.1988) (invoking the *Noerr Pennington* Doctrine to uphold dismissal of civil conspiracy and tortious interference with business relations claims); *Caixa Geral de Depositos, S.A. v. Rodrigues*, 2005 WL 1541055 *11 (D.N.J.2005) (applying the *Noerr Pennington* Doctrine to defamation claims); *Santana Prods. v. Bobrick Washroom Equipment, Inc.*, 249 F.Supp.2d 463 (M.D.Pa. 2003) (Vanaskie, J.) (dismissing Lanham Act claims pursuant to the *Noerr Pennington* Doctrine);[2] *Bristol–Myers Squibb Co. v. Immunex Corp.*, 84 F.Supp.2d 574, 578 (D.N.J.2000) (invoking the *Noerr Pennington* Doctrine to deny as futile a motion to amend seeking to assert a claim for unfair competition). Accordingly, and as stated, Xspand asserts that the doctrine should be extended to all of Plaintiff's claims and that its application serves to bar the same.

█ In resolving this issue, it is well to note that the *Noerr Pennington* Doctrine has its foundations in the First Amendment right to petition the government for a redress of grievances. *See Santana Prods. v. Bobrick Washroom Equipment, Inc.*, 401 F.3d 123, 131 n. 13 (3d Cir.2005) (citing U.S. CONST. amend. I). Accordingly, as intimated above, in order for the doctrine to apply there must be some sort of valid "petitioning activity." *See Hill v. Borough of Kutztown*, 455 F.3d 225, 243 (3d Cir.2006) ("We further hold that [Defendant] is not entitled to petitioning immunity under the *Noerr Pennington* doctrine because the conduct with which he is charged cannot be construed as 'petitioning activity' under any reasonable interpretation of that term."); *see also Bedell*, 263 F.3d at 251 ("[I]f its conduct constitutes valid petitioning, the petitioner is immune from antitrust liability whether or not the injuries are caused by the act of petitioning or are caused by government action which results from the petitioning.").

In defining the contours of "petitioning activity," the Third Circuit has determined that the concept "extends beyond attempts to influence the passage and enforcement of laws and applies equally to efforts to influence administrative agency action, and efforts to access the court system." *Santana Prods.*, 401 F.3d at 131 n. 3 (internal citations omitted). Nonetheless, the concept of "petitioning activity" as it relates to

**2.** Notably, the Third Circuit affirmed our esteemed colleague Judge Thomas I. Vanaskie's dismissal of the Lanham Act claims, but did so on other grounds. *See Santana Prods. v. Bobrick Washroom Equipment, Inc.*, 401 F.3d 123, 131 n. 3 (3d Cir.2005) ("We will not address at this time the *Noerr Pennington* doctrine's applicability to Lanham Act claims because we conclude that Santana's Lanham Act claim is barred by laches.").

*Noerr Pennington* cannot be given a meaning that would provide more extensive protection to petitioning activity than would the First Amendment. *See We, Inc. v. City of Philadelphia*, 174 F.3d 322, 327 (3d Cir.1999).

■ In the case at bar, the "petitioning activity" in question involves the distribution of information by Xspand comparing MRS-facilitated transactions to Xspand-facilitated transactions in an apparent attempt to persuade governmental entities to chose Xspand's services over MRS' services.[3] MRS maintains that the information distributed by Xspand misrepresented that MRS-facilitated transactions produce debt, not revenue, for a governmental entity and could have a negative impact on the entity's credit rating. Even if this conduct qualified as "petitioning activity" for purposes of the *Noerr Pennington* Doctrine, a conclusion that we do not expressly reach, application of that doctrine in the case at bar would be precluded by operation of the "sham exception."[4]

■ The only restriction placed upon the *Noerr Pennington* Doctrine is the so-called 'sham exception,' under which a defendant is not protected "if he or she is simply using the petition process as a means of harassment." *King v. Twp. of East Lampeter*, 17 F.Supp.2d 394, 413 (E.D.Pa.1998). The sham exception applies when "persons use the governmental process—as opposed to the outcome of that process—as an anti-competitive weapon." *City of Columbia v. Omni Outdoor Adver., Inc.*, 499 U.S. 365, 380, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991). Xspand asserts that throughout the pendency of this case MRS has maintained that Xspand's marketing sought to persuade governmental entities to do business with it. Therefore, Xspand argues that MRS should not now be permitted to argue that Xspand's purpose was aimed at something other than competition, *i.e.* harassment. To the contrary, in the amended complaint, MRS alleges that Xspand's marketing efforts "disparage or otherwise seek to disrupt Plaintiff's business," (Doc. 69 ¶ 15), and that "Defendants' misconduct was not for any legitimate purpose, but to prevent Plaintiff from properly and lawfully promoting marketing, and competing in the marketplace," (*id.* ¶ 35). Consequently, we find Xspand's argument to this effect unavailing.[5]

A review of the evidentiary record reveals the existence of facts from which a reasonable juror could determine that Xspand's marketing effort was designed to harass MRS. This conclusion is based upon the following. In or about November 2004, Clive Corner ("Corner"), a former executive at Commerce Bank, Harrisburg

---

3. In the main, this alleged misinformation took the form of a March 1, 2005 mail-merged letter (Doc. 465–16, Ex. 54), a document entitled "New Revenue Opportunity for Pennsylvania School Districts: Converting Tax Claims into Revenue; Frequently Asked Questions Regarding the Xspand Program," (Doc. 465–14, Ex. 29) ("FAQ"), and various power point presentations delivered to a number of governmental decision makers, (*see, e.g.*, Doc. 465–15, Ex. 41) (made to representatives of Norristown School District).

4. Xspand relies heavily on Judge Vanaskie's aforementioned opinion in *Santana Prods. v.*

*Bobrick Washroom Equipment, Inc.*, 249 F.Supp.2d 463 (M.D.Pa.2003). While our determination runs counter to the ultimate conclusion in that case, we note that these opinions are not necessarily discordant, since the sham exception was not at issue in *Santana Products.*

5. Indeed, Federal Rule of Civil Procedure 8 permits parties to plead inconsistent and conflicting theories of recovery. *See Kayea v. Prudential Ins. Co. of America*, 2008 WL 1867154 *1 (D.Del.2008). This is exactly what MRS has done.

("Commerce"), the institution MRS used to finance its tax lien purchases, was contacted by James Florio, former Governor of New Jersey and a founder of Xspand ("Gov. Florio"), who expressed concerns regarding the legality of MRS-facilitated transactions.[6] Clive Corner Deposition, November 15, 2005, p. 13. This concern was subsequently relayed to Commerce's counsel, who ultimately determined that there was no legal issue. *See id.* p. 17 ("I believe that Knox Graham and Reed, Smith, Shaw & McClay looked at the deal.... [T]he consensus ... of all the attorneys [was that] there was no legal issue to be concerned about."). To the best of his knowledge, Corner communicated this conclusion to Gov. Florio. *Id.* p. 63. Nonetheless, Xspand proceeded to distribute to governmental entities information indicating that MRS-facilitated transactions produced debt, not revenue, which could have a negative impact on the municipalities credit rating. (*See, e.g.,* Doc. 465–14 (Xspand's FAQ document));

Doc. 465–16 (Xspand's mail-merged letter of March 1, 2005).[7]

Additionally, Xspand has acknowledged that there were least two factual inaccuracies present in the advertisements it distributed. Specifically, Xspand conceded that in the FAQ document it stated that the Harrisburg School District had actually accounted for the funds received from its MRS-facilitated transaction as debt rather than revenue. (Doc. 465–14). It now admits that this assertion was false. (Doc. 479, p. 7 n. 3). Further, in the March 1, 2005 letter, Xspand represented that it had entered into lien-sale contracts with several municipalities, including Allentown, Pennsylvania. · (Doc. 465–16). However, Xspand now admits that it never had consummated such a transaction with the City of Allentown.[8]

Based upon the foregoing, we believe that a reasonable person could infer that Xspand's conduct was primarily tailored to disrupt MRS' business rather than directly

---

6. This communication could reasonably indicate that Xspand's intent in disseminating information regarding the alleged illegality of MRS-facilitated transactions was to cripple MRS, and not necessarily to acquire business for itself. After all, this communication was not designed to sway customers into choosing Xspand's services; it was arguably meant to stifle MRS' financing so that MRS could not afford to compete with Xspand in the marketplace.

7. The March 1, 2005 letter was signed by Nancy Cerbus ("Cerbus"), who was identified as Xspand's Vice–President of Business Development. (*See* Doc. 465–16). However, Cerbus testified that she did not compose the letter but rather authorized Xspand to sign her name thereto. Nancy Cerbus Deposition, August 23, 2005, pp. 93–94. Cerbus admittedly knew very little about the subjects addressed in the March 1, 2005 letter. *See id.* 93–119. She asserted that Paul Scura ("Scura"), president and chief executive officer of Plymouth Financial Company, Inc., the parent corporation of Xspand, authored the let-

ter. *Id.* Scura, who is the President of Xspand, testified that he did not have a certified public accountant or a lawyer review the accuracy of the MRS-related allegations contained in the March 1, 2005 letter prior to distributing the same. Paul Scura Deposition, August 24, 2005, pp. 146–47. Scura, who has "over 20 years of experience in structured finance," testified that the MRS-related opinions were rendered based upon the understanding of generally accepted accounting principles he has gained in his over 20 years of experience in the field of municipal finance. *Id.* pp. 135–36.

8. Moreover, in November 2004, Xspand initially identified a list of 136 prime school districts that it would target. (Doc. 465–14). However, the March 1, 2005 letter was, according to Cerbus, distributed to 250 entities. Cerbus Dep. p. 99. Cerbus testified that Xspand did not intend to follow-up with all of the recipients of the March 1, 2005 letter; instead, only certain entities were identified for follow-ups. *Id.* p. 103.

designed to garner favorable government action for itself. Indeed, MRS has proffered evidence from Dr. Marvin E. Goldberg, Professor of Marketing at the Pennsylvania State University, to that effect. (*See* Doc. 444–2 p. 3) (concluding that Xspand's marketing strategy was not "standard" and could have readily poisoned the business atmosphere for MRS) [9] We shall therefore deny the Xspand Motion to this extent.

9. While there is evidence that Xpsand's marketing campaign was designed to garner favorable government action in the form of increased business, we believe that the foregoing facts cast doubt upon Xpsand's true motive. As the Third Circuit has recognized, "Motive may be relevant if it demonstrates the party acted without a legitimate desire for government action...." *Bedell*, 263 F.3d at 254 n. 33. Therefore, we believe that the ultimate applicability of the sham exception is an issue for the jury to decide.

10. "To establish a Lanham Act claim based on a false or misleading representation of a product the plaintiff must show: (i) that the defendant has made *false* or misleading statements as to his own product [or another's]; (ii) that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience; (iii) that the deception is material in that it is likely to influence purchasing decisions; (iv) that the advertised goods traveled in interstate commerce; and (v) that there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, etc." *Warner–Lambert v. BreathAsure, Inc.*, 204 F.3d 87, 91–92 (3d Cir.2000) (emphasis added). We note briefly that, as we explain in greater detail in our resolution of the MRS Motion, to the extent MRS seeks monetary damages pursuant to its Lanham Act false advertising claim, it must adduce evidence of causation, *i.e.* actual consumer deception, regardless of whether the challenged marketing statement was "literally false." *See, e.g., Gallup, Inc. v. Talentpoint, Inc.*, 2001 WL 1450592 *13 (E.D.Pa.2001) ("Where plaintiff seeks *injunctive relief*, and shows that a claim is literally false, a court need not consider whether the public is misled. Where, however, a plaintiff seeks *monetary damages*, proof of actual deception is required.").

The second global infirmity complained of by Xspand is the purported inability of MRS to establish that Xspand's marketing statements were false, a necessary element of MRS' Lanham Act,[10] unfair competition,[11] defamation,[12] and commercial disparagement claims.[13] Xspand contends that expert testimony on this point is necessary because its statements to the effect that "MRS-facilitated transactions are borrowings and cannot be bud-

11. "The common law cause of action for unfair competition in Pennsylvania mirrors the Lanham Act's section 43(a) cause of action for unfair competition, except that under state law there is no requirement that the goods traveled through interstate commerce." *Louis Vuitton Malletier & Oakley, Inc. v. Veit*, 211 F.Supp.2d 567, 582 (E.D.Pa.2002).

12. "In a defamation case, a plaintiff must prove: '(i) The defamatory character of the communication; (ii) its publication by the defendant; (iii) its application to the plaintiff; (iv) the understanding by the recipient of its defamatory meaning; (v) the understanding by the recipient of it as intended to be applied to the plaintiff; (vi) special harm resulting to the plaintiff from its publication; and (vii) abuse of a conditionally privileged occasion.' " *Moore v. Cobb–Nettleton*, 889 A.2d 1262, 1267 (Pa.Super.Ct.2005) (quoting *Porter v. Joy Realty, Inc.*, 872 A.2d 846, 849 n. 6 (Pa.Super.Ct.2005) (quoting 42 Pa.C.S. § 8343(a))). Falsity is an implicit element of a defamation cause of action because truth is an absolute defense. *See* 42 Pa.C.S. § 8343(b).

13. "In Pennsylvania, a claim for commercial disparagement requires proof that: (i) the statement is *false;* (ii) the publisher either intends the publication to cause pecuniary loss or reasonably should recognize that publication will result in pecuniary loss; (iii) pecuniary loss does in fact result; and (iv) the publisher either knows that the statement is false or acts in reckless disregard of its truth or falsity." *McNulty v. Citadel Broadcasting Co.*, 58 Fed.Appx. 556, 567 (3d Cir.2003) (emphasis added) (citing *Neurotron, Inc. v. Med. Servs. Ass'n of Pa., Inc.*, 254 F.3d 444 (3d Cir.2001)).

geted as revenue" were intended to convey the notion that MRS could not *properly* book the proceeds of their tax-lien transactions as revenue. (*See* Doc. 447, pp. 27, 28). Xspand asserts that the testimony of Plaintiff's witness Charles Herron ("Herron") is inadmissable to establish falsity. (Doc. 447, pp. 28–29).[14] MRS, on the other hand, contends that Xspand's statements were meant to convey the notion that MRS customers *did not actually* book the proceeds of MRS-facilitated transactions as revenue. (*See* Doc. 468, p. 14). Consequently, MRS asserts that since the Xspand statements are "literally false," there is no need for expert testimony on the issue of falsity. (*Id.*).

In effect, MRS suggests that Xspand's marketing statements were literally false because MRS customers did in fact book the proceeds of MRS-facilitated transactions as revenue.[15] We find this reasoning unpersuasive for the following reasons. First, it is circular in nature, as it essentially posits that the proceeds from MRS-facilitated transactions were revenue because the MRS customers said they were revenue. Unfortunately for Plaintiff, something does not become true merely because one says it is true. Second, in order for MRS' proposition to be true, Xspand's marketing statements must be interpreted to assert that proceeds from MRS-facilitated transactions cannot *physically* be booked as revenue. We do not believe that any reasonable person would interpret Xpsand's marketing statement in this manner, since it is, after all, *physically possible* for an MRS customer to record the proceeds of an MRS-facilitated transaction in any way it wishes. Therefore, interpreting the marketing statement in the way suggested by MRS is, in our estimation, nonsensical and illogical. This conclusion is buttressed by the fact that MRS fails to point us to any evidence indicating that any recipient of the marketing statement ascribed that meaning to it. Accordingly, we believe that any reasonable person would interpret Xspand's marketing statement to address how the proceeds from MRS-facilitated transactions *should have been properly* booked. Therefore, it is axiomatic that to prove the falsity of this statement, MRS must proffer expert testimony. *See* Fed.R.Evid. 702.[16] (requiring expert testimony when

14. Xspand has filed a currently pending motion in limine to this extent. (Doc. 441).

15. Insofar as MRS' literal falsity argument involves Xspand's representation regarding a business relationship with the city of Allentown, we note that Xspand has already admitted the falsity of this statement. However, MRS has not adduced any evidence indicating that this statement induced anyone to abandon a potential business relationship with MRS in favor of one with Xspand. Accordingly, as is evident from our causation analysis, *infra*, this averment cannot support any of the claims in the complaint because MRS cannot establish causation as to it. Consequently, we need not further address it in the instant context.

16. Expert testimony would be required even if a reasonable person could interpret Xspand's statement in the manner suggested by MRS because, even in that event, the statement would not be "literally false." "In analyzing whether an advertisement . . . is literally false, a court must determine, first, the unambiguous claims made by the advertisement . . . and, second, whether those claims are false." *Novartis Consumer Health, Inc. v. Johnson & Johnson–Merck Consumer Pharms. Co.*, 290 F.3d 578, 586 (3d Cir.2002). Accordingly, since Xspand's marketing statement is reasonably susceptible to the interpretation suggested by Xspand, in which case the statement would not be false if MRS customers improperly booked proceeds from MRS-facilitated transactions as revenue, the statement is not "unambiguous" and cannot therefore be literally false for Lanham Act purposes. *See id.; see also Schering–Plough Healthcare Prods. v. Neutrogena Corp.*, 2010 WL 960635 *3 (D.Del. 2010). As we state in our discussion of the MRS Motion, *infra*, most of Xspand's statements are not "literally false" for this reason.

factual matters are outside the ken of lay individuals).

Although Herron, a certified public accountant with significant experience in governmental accounting, was not deposed as an expert, he did provide testimony to the effect that, based on his experience and knowledge, the statements in the Xspand marketing materials were false in that MRS-facilitated transactions are properly booked as revenue, not debt.[17] Subsequent to Herron's depositions, Xspand filed a motion in limine seeking to exclude his testimony because it was unreliable.[18] During a hearing regarding Defendants' motion to exclude Herron's expert testimony, MRS indicated that it would only be calling Herron as an expert in the event that Defendants' expert, Professor Peter H. Knutson ("Knutson"), was permitted to testify. In such an event, MRS agreed to make Herron available for an "expert" deposition at which Defendants could more fully explore the foundation of his opinions involving the accounting issues present in this case. Since we have determined that Knutson's expert opinion is admissible,

(Doc. 510), we can only assume that MRS shall be offering Herron as an expert either in its case in chief or to rebut the testimony provided by Knutson. Accordingly, an "expert" deposition of Herron will now be necessary. The parties agreed that this deposition would occur after the resolution of the pending summary judgment motions,[19] meaning that the motion in limine seeking to exclude Herron's opinion would likewise be tabled until that time. (*See* Docs. 511, 515).[20] Since we can foresee a circumstance in which Herron provides admissible expert testimony related to the falsity of Xspand's marketing statements, we shall deny the Xspand Motion to this extent.[21] As indicated above, Herron's testimony is vital because if it is inadmissible, MRS may not be able to prove its case, as it will very likely be unable to establish the falsity of Xspand's marketing statements.

With regard to Xspand's third and final global argument in favor of dismissal, it asserts that MRS has failed to produce evidence as to causation, an element criti-

---

**17.** When asked what the basis for this conclusion was, Herron responded, "The blue book, Governmental Accounting and Auditing— what do you call it? The blue book." Herron Dep., November 15, 2005, 24:4–25:13.

**18.** Herron's testimony is uniquely vital to MRS' claims because we do not perceive that it has provided testimony from any other individual as to the actual falsity of Xspand's statements.

**19.** Xspand's decision to table the expert deposition of Herron was rendered on the apparent assumption that the expert opinion of Herron was not implicated in the resolution of the pending summary judgment motions because MRS did not rely on it in opposing said motions. (*See* Doc. 511). However, in resolving a motion for summary judgment, the Court is not constrained to consider only those arguments interposed by counsel. MRS' failure to argue the impact of Herron's

testimony does not preclude us from considering the same. Herron's testimony regarding the falsity of Xspand's statements is clearly relevant to the proper resolution of the pending motions.

**20.** Since the motion in limine seeking to exclude Herron as an expert cannot be resolved before the taking of his "expert" deposition, and indeed since that deposition may or may not obviate the need for the motion, we believe that the better course is to deny the pending motion (Doc. 441) with express leave to re-file within 30 days of receiving the transcript from Herron's expert deposition.

**21.** We do not believe that this procedure prejudices Xspand because, as its motion in limine seeking the exclusion of Herron's testimony indicates, it recognized the importance of Herron's testimony but elected instead to have us decide the instant motions without deciding the motion in limine first.

cal to all five causes of action.[22] Specifically, Xspand contends that Herron, as principal of Xspand, was the only witness offered to prove causation and that his testimony cannot defeat summary judgment. For the following reasons, we do not agree.

Consider Herron's deposition testimony to the following effect:

Q: [W]hat client or potential client ... have you met with where you believe there's evidence that that client is any less likely to do business with MRS because of Xspand's March 1, 2005 letter?

A: Everywhere I've met and the business director or the superintendent or the tax claim bureau director has pulled the letter out and wanted to discuss it.

\* \* \*

Q: ... Is that the only evidence that you have that the letter is in any way affecting their thinking about whether they'll do business with MRS?

\* \* \*

A: No, they mention it in phone calls when we're trying to set up appointments and things.

\* \* \*

Q: Okay. And what about those communications suggests to you that

the letter has made them any less likely to do business with ... MRS?

A: Many of them were more agreeable to setting up meetings and move very quickly to meet some budget deadlines they have. And now they are moving very slowly and are putting it on the back burner until they are able to slowly, methodically get appropriate responses to the letter.

Q: ... [H]ave any of the school districts actually said to you words to the effect of we're putting our discussion with MRS on the back burner until we get responses and information with respect to Xspand's March 1, 2005 letter?

A: There's been a couple. I don't recall which ones.

Herron Deposition, June 1, 2005 pp. 216–218. Herron further testified as follows:

Q: Has anyone from any school district, municipality, county or other taxing entity ever told you that [the March 1, 2005 mail-merged letter from Xspand] persuaded them not to do business with MRS?

A: I believe East Stroudsburg and Norristown.

*Id.* 214:22–215:1.

This testimony could clearly lead a reasonable juror to conclude that Xspand's March 1, 2005 letter caused harm to MRS.[23] Xspand contends that there is rec-

---

**22.** The elements of the causes of action in Count I–IV were articulated above. As is evident, each of them requires proof of causation. The fifth cause of action, contained in Count V of the amended complaint, is tortious interference with prospective contractual relations. "The requisite elements of a cause of action for interference with prospective contractual relations are as follows: (i) a prospective contractual relationship; (ii) the purpose or intent to harm the plaintiff by preventing the relation from occurring; (iii) the absence of privilege or justification on the

part of the defendant; and (iv) the occasioning of actual damage resulting from the defendant's conduct." *Phillips v. Selig*, 959 A.2d 420, 428 (Pa.Super.Ct.2008) (citations omitted). Accordingly, it is clear that this cause of action also requires proof of causation.

**23.** Further, other portions of Mr. Herron's testimony indicate that he was in the midst of a process involving the release of information from various tax claim bureaus, a process that in his experience rapidly culminated in a

ord evidence indicating that conclusions such as this are based solely on Herron's speculation. To the extent such testimony exists, it clearly conflicts with the above-quoted testimony in which Herron unequivocally states that certain individuals informed him that Xspand's March 1, 2005 letter persuaded them to either put an MRS-facilitated transaction on the "back burner" or forego such a transaction altogether. Consequently, a credibility issue arises, and such determinations reside within the exclusive province of the jury.

■ Xspand also contends that the above-quoted testimony, and testimony like it, cannot defeat a summary judgment motion because it is inadmissible hearsay. *See Smith v. City of Allentown*, 589 F.3d 684, 693 (3d Cir.2009) ("Hearsay statements that would be inadmissible at trial may not be considered for purposes of summary judgment.") (citations omitted). MRS responds that testimony like the afore-quoted is admissible because, pursuant to Federal Rule of Evidence 803, it is not hearsay. This rule states:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> * * *
>
> A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed

unless it relates to the execution, revocation, identification, or terms of declarant's will.

Fed.R.Evid. 803(3) ("Rule 803(3)").

■ The Third Circuit Court of Appeals has noted that statements of a customer to an employee are admissible if the customer's motive is relevant to the action. *See J.F. Feeser, Inc. v. Serv–A–Portion, Inc.*, 909 F.2d 1524, 1535 n. 11 (3d Cir.1990); *see also* WEINSTEIN'S FEDERAL EVIDENCE § 803.05 (2007). Indeed, "hearsay statements of a customer as to his reasons for not dealing with a supplier may be admissible for the limited purpose of proving customer motive. It is only if the statements are used to prove the fact that the customer stopped buying the product from this supplier, bought the product from someone else instead, or stopped buying the product altogether, that they become inadmissible." *New L & N Sales & Mktg., Inc. v. Menaged*, 1998 WL 575270 *5 (E.D.Pa.1998) (citing *Stelwagon Mfg. Co. v. Tarmac Roofing Sys., Inc.*, 63 F.3d 1267, 1274 (3d Cir.1995)). Here, the government entities' motives are relevant in establishing whether or not Xspand's marketing strategy caused harm to MRS, and are only being offered to establish why the government entities chose not to employ MRS' services.

Xspand argues that Rule 803(3) cannot save statements such as the afore-quoted because it relates solely to the *declarant's* then-existing state of mind. Xspand con-

---

sale, with seven to ten schools districts when the March 1, 2005 letter was distributed. *See* Herron Dep. June 1, 2005, 231:23–232:11. After the receipt of the letter, a number of those districts "slowed down" their discussions with MRS. *See id.* 232:11–233:15. Although Herron's testimony does not explicitly indicate that the March 1, 2005 letter caused the "slow downs," given the numerosity and timing of the alleged "slow downs," we be-

lieve that a jury could reasonably infer that they were engendered by Xspand's marketing letter. Further, to the extent that these districts elected not to contract with MRS, we believe that, given the historical progression of the process that the March 1, 2005 interrupted, the afore-referenced testimony could lead a reasonable jury to conclude that MRS was harmed by Xspand's marketing statements.

tends that Herron's testimony involves a declarant who testifies about a particular *school board's* then-existing state of mind. After all, Xspands asserts, the ultimate decision about whether to do business with MRS rested not with a single individual but with a group of individuals statutorily charged with making such decisions.[24] Although innovative, we find Xspand's argument unavailing. Since Rule 803(3) clearly applies to statements made by individual customers, we fail to see why it would not apply to an individual who is an official representative of a corporate or governmental customer. After all, most decisions made by these entities are made by a board comprised of multiple individuals. If Xspand's construction of Rule 803(3) held true, out-of-court statements by persons with authority at these entities as to the motives underlying their board's decisions would be inadmissible under 803(3), but out-of-court statements by a sole-proprietor as to the motives behind the decisions regarding his business would be admissible. We do not believe that the Federal Rules of Evidence were intended to produce such an odd and inequitable result. Accordingly, we believe that the declarants in question in the case *sub judice*, as representatives of their respective school districts, can render out-of-court statements admissible under Rule 803(3) as to the motives underlying the business decisions of the entities that they represent. Consequently, statements such as the afore-quoted are admissible under 803(3).[25] Since such statements reasonably establish causation, we shall deny the Xspand Motion to this extent.

This concludes our discussion of the "global" issues raised by Xspand. We now turn our attention to its more discrete arguments.

### ii. Discrete Infirmities

#### a. Defamation Claim

■ As we stated above, "In a defamation case, a plaintiff must prove: (i) the defamatory character of the communication; (ii) its publication by the defendant; (iii) its application to the plaintiff; (iv) the understanding by the recipient of its defamatory meaning; (v) the understanding by the recipient of it as intended to be applied to the plaintiff; (vi) special harm resulting to the plaintiff from its publication; and (vii) abuse of a conditionally privileged occasion." *Moore v. Cobb–Nettleton*, 889 A.2d at 1267 (citations omitted) (internal quotations omitted). Xspand asserts that MRS cannot prove that its marketing statements were of a defamatory character.

■ To determine whether a statement is capable of a defamatory meaning, courts consider whether "the statement tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third parties from associating or dealing with him." *Tucker v. Phila. Daily News*, 577 Pa. 598, 848 A.2d 113, 124 (2004). While an action for defamation normally focuses on whether the statement in question tarnishes the reputation of the plaintiff, and an action for commercial disparagement focuses on

---

**24.** Xspand offers no legal authority to support this conclusion, nor can we locate any.

**25.** At this time, we note that to the extent that Xspand contends that the afore-quoted statement is inadmissible because Herron cannot identify the declarant, such a proposition is incorrect. *See Callahan v. A.E.V., Inc.*, 182 F.3d 237 (3d Cir.1999) ("We do not think that the admissibility of their statements under the Rule 803(3) hearsay exception depends on their being identified. Knowing the specific identity of the declarant will not make the statements more trustworthy evidence of the declarant's descriptions of their states of mind, the primary concern in interpreting hearsay exceptions.").

the statements regarding the plaintiff's goods or services, there are times when impugnation of product quality crosses the line from disparagement of products to defamation of vendors. *See U.S. Health-care, Inc. v. Blue Cross of Greater Philadelphia,* 898 F.2d 914, 923–24 (3d Cir.1990) (citations omitted). To that end, the Third Circuit Court of Appeals has noted:

> [W]here the publication on its face is directed against the goods or product of a corporate vendor or manufacturer, it will not be held libelous per se as to the corporation, unless by fair construction and without the aid of *extrinsic evidence* it imputes to the corporation fraud, deceit, dishonesty, or reprehensible conduct in its business in relation to said goods or product.

*Id.* (citations omitted) (emphasis added).[26]

██ With regard to Xspand's March 1, 2005 mail-merged letter, this document explicitly stated that MRS-facilitated transactions were not true sales but were, instead, borrowings. Neither this statement, nor any of Xspand's marketing statements, indicate that MRS advertises itself as facilitating transactions that produce revenue, not debt, to the taxing entity. Thus, in order for Xspand's marketing statements regarding the quality of MRS' services to impugn MRS' integrity, the recipient of Xspand's marketing statement would have had to receive a communication from MRS in which MRS describes its services. Such extrinsic evidence is proscribed when determining whether a statement denigrates products or the vendor.[27] Accordingly, since Xspand's marketing statements do not in themselves call into question MRS' integrity without the use of extrinsic evidence, we believe that they are in fact incapable of a defamatory meaning.[28] As a result,

---

**26.** The proscription against use of extrinsic evidence in determining whether a statement crosses the line from disparagement into defamation seems to be at odds with the general notion that in determining whether a statement is capable of defamatory meaning, courts are to "consider the likely interpretation of the statement by the intended audience," *Baker v. Lafayette College,* 350 Pa.Super. 68, 504 A.2d 247 (Pa.Super.Ct.1986), as well as the context in which the statement is made, *Beckman v. Dunn,* 276 Pa.Super. 527, 419 A.2d 583, 586 (Pa.Super Ct.1981). However, we believe that these rules can be synthesized in the following manner. While extrinsic evidence cannot be used when determining whether a statement denigrates the products or vendor, it can be taken into consideration *after* determining that the statement denigrates the vendor, *i.e.,* only after the court determines that the statement is of a type that *could* be capable of defamatory meaning. In that case, the context in which the statement is made is important in determining whether the statement *is* capable of defamatory meaning. This conclusion is buttressed by our recognition that all the cases cited by MRS for the proposition that "any communications by a competitor that im-

putes a want of integrity in business dealings are certainly capable of a defamatory meaning" involve situations where the communication, in isolation, give rise to the inference of dishonesty. *See, e.g., Steaks Unlimited, Inc. v. Deaner,* 623 F.2d 264 (3d Cir.1980) (the denigrating television broadcast itself contained statements that readily questioned the honesty of plaintiff's advertising); *Tucker v. Phila. Daily News,* 848 A.2d at 124 (*inherent* implausibility of the ideas communicated by the statements at issue were capable of making the plaintiffs look insincere, excessively litigious, avaricious, and perhaps unstable); *Cosgrove Studio & Camera Shop v. Pane,* 408 Pa. 314, 182 A.2d 751 (1962) ("no extrinsic proof was necessary to indicate the injurious character of the communication").

**27.** Indeed, we read *U.S. Healthcare* to hold that in order for a statement to cross the line from a disparagement of product to defamation of vendor, the statement itself must either expressly or impliedly allege that the plaintiff is dishonest or otherwise disreputable.

**28.** Notwithstanding our conclusion, and as such set forth in the section that follows, these statements may denigrate product quality and

we shall grant the Xspand Motion to the extent it involves MRS' defamation claim.

### b. Commercial Disparagement Claim

■ As stated above, to sustain a claim for commercial disparagement in Pennsylvania, a plaintiff must prove that: "(i) the statement is false; (ii) the publisher either intends the publication to cause pecuniary loss or reasonably should recognize that publication will result in pecuniary loss; (iii) pecuniary loss does in fact result; and (iv) the publisher either knows that the statement is false or acts in reckless disregard of its truth or falsity." *McNulty v. Citadel Broad. Co.*, 58 Fed.Appx. 556, 567 (3d Cir.2003) (citing *Neurotron, Inc. v. Med. Servs. Ass'n of Pa., Inc.*, 254 F.3d 444 (3d Cir.2001)). In addition to the arguments relating to falsity and causation, which we addressed above, Xspand also contends that MRS cannot maintain its commercial disparagement claim because there is no evidence that Xspand knew any of its statements were false or that it acted with reckless disregard for the truth or falsity of the statements.

■ To this end, Xspand notes that Paul Scura, Xspand's president, was the individual who oversaw the drafting of Xspand's March 1, 2005 letter. Scura Dep., Aug. 24, 2005 pp. 81–82. Before disseminating the letter, Scura, who has extensive experience in municipal finance, Scura Declaration ¶¶ 2–8, obtained and reviewed a copy of the purchase and sales agreement used in MRS-facilitated transactions, Scura Dep., Aug. 24, 2005, p. 83. According to Xspand, this level of precau-

tion precludes its conduct from being categorized as "reckless."

For our purposes, "reckless disregard" is defined as the "serious indifference to truth or accuracy of a publication." BLACK'S LAW DICTIONARY (8th ed.2004). As we have already stated, there is evidence from which a reasonable jury could infer that Xspand was aware that attorneys at two prominent law firms examined the structure of MRS-facilitated transactions and concluded that it was legal. Further, Scura himself testified that he did not consult any lawyers or certified public accountants regarding the truth of the statements made in the March 1, 2005 letter before distributing the same. Scura Deposition, August 24, 2005, pp. 146–47. In spite of the 20 years of structured finance experience that led him to believe consultation with a lawyer or accountant was unnecessary, given the purported knowledge Xspand possessed about the legality of the MRS-facilitated transactions, we believe that the reasonableness and/or level of indifference, if any, of Scura's actions is for a jury to decide. Therefore, we shall deny the Xspand Motion in this regard.

### c. Tortious Interference Claim

■ As stated above, the requisite elements for a tortious interference with prospective contractual relations claim are as follows: "(i) a prospective contractual relationship; [29] (ii) the purpose or intent to harm the plaintiff by preventing the relation from occurring; (iii) the absence of privilege or justification on the part of the defendant; and (iv) the occasioning of actual damage resulting from the defendant's conduct." *Phillips v. Selig*, 959 A.2d 420,

could therefore be used to support a commercial disparagement claim.

**29.** A "prospective contractual relationship" is "something less than a contractual right, something more than a mere hope" and exists

when there is "reasonable probability that a contract will arise from the parties' current dealings." *Alvord–Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1015 (3d Cir.1994) (citations omitted).

428 (Pa.Super.Ct.2008) (citations omitted). Xspand asserts that MRS' tortious interference claim suffers from the following flaws: (i) there is no evidence indicating any "reasonable probability" that MRS would have entered into any lien-transactions if it were not for the marketing efforts of Xspand; and (ii) Xspand's conduct is protected by the "competitor's privilege." We address these arguments in turn.

■ Xspand asserts that the first contention relates particularly to the East Stroudsburg School District. (Doc. 447, p. 41). While Xspand cites no record evidence for this proposition, there is record evidence to the contrary. Consider the deposition testimony of Herron:

Q: Has anyone from any school district, municipality, county or other taxing entity ever told you that [the March 1, 2005 mail-merged letter from Xspand] persuaded them not to do business with MRS?

A: I believe East Stroudsburg and Norristown.

Herron Deposition, June 1, 2005, 214:22–215:1; *see also id.* 231:11–244:4 (for the same proposition). This is record evidence from which a reasonable jury could infer that MRS had a "reasonable probability" of obtaining the business of the East Stroudsburg and Norristown school dis-

tricts were it not for the marketing activities of Xspand.[30] To the extent that there is record evidence contradicting the aforequoted testimony, a credibility determination would arise. Since such decisions are the exclusive province of the jury, we shall deny the Xspand Motion insofar as it rests on the above-referenced argument. *See Nanton v. People of the Virgin Islands,* 2009 WL 5449226 *26 (D.V.I.2009) (citing *United States v. Boone,* 279 F.3d 163, 189 (3d Cir.2002)) (for the proposition that to the extent a witness provides conflicting testimony, such conflicts implicate credibility determinations for the jury).

With regard to the "competitor's privilege," Xspand notes that Pennsylvania follows the rendition memorialized in the Second Restatement of Torts. *See Acumed LLC v. Advanced Surgical Servs., Inc.,* 561 F.3d 199, 215 (3d Cir.2009) (citations omitted). This provision states as follows:

(i) One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor, or not to continue an existing contract terminable at will, does not interfere improperly with the other's relation if:

(a) the relation concerns a matter involved in the competition between the actor and the other, and

---

**30.** Additionally, as indicated in our hearsay discussion, *supra,* Mr. Herron's testimony indicates that he was in the midst of a process involving the release of information from various tax claim bureaus, a sequence that historically proceeds rapidly and culminates in a sale, with seven to ten schools districts when the March 1, 2005 letter was distributed. *See* Herron Dep. June 1, 2005, 231:23–232:11. After the receipt of the letter, a number of those districts "slowed down" their discussions with MRS. *See id.* 232:11–233:15. Although Herron's testimony does not explicitly indicate that the March 1, 2005 letter caused the "slow downs," given the numerosity and

timing of alleged "slow downs," we believe that a jury could reasonably infer that they were engendered by Xspand's marketing letter. Further, given the historical progression of the process that the March 1, 2005 interrupted, we believe that the afore-referenced testimony could lead a reasonable jury to determine that MRS had "reasonable expectations" of entering into a contractual relationship with those seven to ten school districts. To the extent that these school districts ultimately decided not to contract with MRS, we believe a reasonable jury could determine that MRS suffered harm, meaning MRS has a cognizable tortious interference claim.

(b) the actor does not employ wrongful means, and

(c) his action does not create or continue an unlawful restraint of trade, and

(d) his purpose is at least in part to advance his interest in competing with the other.

(ii) The fact that one is a competitor of another for the business of a third person does not prevent his causing a breach of an existing contract with the other from being an improper interference if the contract is not terminable at will.

RESTATEMENT (SECOND) OF TORTS § 768.

As we have already concluded, assuming MRS can adduce testimony from Herron as to the falsity of Xspand's marketing statements, MRS can maintain a claim of commercial disparagement. In such a case, Xspand would have utilized "wrongful means," meaning that its "competitor's privilege" would be eviscerated. *See Patient Transfer Sys. v. Patient Handling Solutions, Inc.*, 1999 WL 1212189 (E.D.Pa. 1999). Accordingly, we shall deny the Xspand Motion to this extent, noting however as we do, that here again Herron's potential but not yet authorized expert testimony is the lynchpin of MRS' claim.

### d. Claims Relating to Commerce Bank

Xspand contends that the alleged contact between Gov. Florio and Commerce bank did not cause Commerce to modify its business relationship with MRS and therefore did not harm MRS. In support of this assertion, and as aforementioned, Xspand cites the deposition testimony of Clive Corner, a former executive at Commerce who allegedly received phone call from Gov. Florio regarding the illegality of MRS-facilitated transactions. After acknowledging that Commerce consulted its lawyers to review the legality of MRS-structured transactions, Corner testified as follows:

A: Apparently, the consensus of opinion of all the attorneys [was that there] was no legal issue to be concerned about. The transactions closed and there have been transactions since.

\* \* \*

Q: Would it be fair for me to understand, Mr. Corner, from your testimony that whatever concerns Mr. Florio passed along to Commerce did not cause Commerce to change its business practices with regard to MRS?

A: That's correct.

Clive Corner Dep., Nov. 14, 2005, 17:16–18:4.

However, in contravention to this, we also have the deposition testimony of Herron to the following effect:

Q: Did Mr. Corner tell you that Commerce Bank was going to in any way change its business dealings with MRS in response to any communication from Governor Florio?

A: They did change their business dealings in fact from the original experience with Commerce to the time they agreed to do transactions.

Herron Dep., Nov. 15, 2005, 17:6–12. Herron proceeded to describe how Commerce, Commerce Bank, New Jersey,[31] and MRS had settled on the rate, terms, and struc-

---

**31.** Commerce, Harrisburg, which we have been referring to as "Commerce," and Commerce Bank, New Jersey ("Commerce New Jersey") are separate organizations, however, the former is a franchise of the latter. Corner Dep., 6:11–24. Corner is a former executive with Commerce. *Id.*

ture of the school transactions prior to receiving Gov. Florio's phone call. *Id.* 17:14–18:13. After the phone call, Herron testified that MRS was forced to restructure the contemplated transactions with less favorable terms from Commerce after Commerce New Jersey was non-responsive to MRS' attempted communications.[32] *Id.* When asked whether Corner informed him that Commerce New Jersey changed its approach to MRS because of any communications by Gov. Florio, Herron responded, "He (Corner) didn't volunteer it, and I didn't ask him." *See id.* 18:14–19.

For our purposes then, it appears that Herron was not explicitly told that the Xspand letter caused the need to restructure the transactions at a less favorable rate with Commerce. Herron's conclusion that Gov. Florio's call adversely affected MRS' financing is based purely upon the sequence of events recounted above. Indeed, MRS reasons that since Gov. Florio's call occurred at a moment in time between the points at which Commerce New Jersey agreed to participate in the financing of MRS-facilitated transactions and its subsequent change of course in that regard, the temporal sequence implies that MRS' financing was adversely affected by Gov. Florio's phone call. Quite simply, such a conclusion is based upon pure speculation.

There is no evidence linking Gov. Florio's phone call with any delay in MRS receiving financing or experiencing a change in financing terms.[33] Accordingly, we will grant the Xspand Motion to this extent.

### e. Lost Profits Remedy

■ Under Pennsylvania law, lost profits may be recovered when: (i) there is evidence to establish the damages with reasonable certainty; (ii) they were the proximate consequence of the alleged wrong; and (iii) they were reasonably foreseeable. *See Advent Sys. Ltd. v. Unisys Corp.*, 925 F.2d 670, 680 (3d Cir.1991); *see also Delahanty v. First Pennsylvania Bank, N.A.*, 318 Pa.Super. 90, 464 A.2d 1243, 1258 (Pa.Super.Ct.1983). While a plaintiff's proof of damages need not be mathematically precise, the evidence must establish the fact of damages "with a fair degree of probability." *Advent*, 925 F.2d at 680 (citations omitted). Xspand particularly notes that Pennsylvania courts have been skeptical of claims for lost profits by a "new and untried business." *Exton Drive–In, Inc. v. Home Indemnity Com.*, 436 Pa. 480, 261 A.2d 319, 324 (1969).

We begin by noting that Xspand has not cited authority for the proposition that MRS is in fact a "new and untried busi-

---

**32.** Commerce New Jersey was involved in the initial transaction because it had an appreciably larger lending capacity than Commerce. *See* Herron Dep., Nov. 15, 2005, 17:20–24.

**33.** This determination is not inconsistent with our conclusion involving causation. There, we were faced with a situation where a multitude of school districts, which embarked upon a course that historically concluded with the rapid consummation of a contract, decided to slow down, and in some cases, abandon, the contract formation process after receiving Xspand's March 1, 2005 letter. In that instance, we concluded that the numerosity and timing of the school board's decisions, which contravened historical patterns, could reasonably lead a jury to infer that the March 1,

2005 letter caused the change in the school boards' actions. Here, we lack the numerosity and historical pattern upon which our causation determination was predicated. Further, unlike the situation implicated in our causation analysis, the present determination does not involve direct testimony establishing a causal link between Xspand's marketing conduct and the alleged harm suffered by MRS. Quite simply, the fact that the single Event A (Florio phone call) occurred before Event B (Commerce New Jersey's change of course) *in and of itself* does not mean that Event A caused Event B. Such reasoning exemplifies the *post hoc ergo propter hoc* logical fallacy.

ness." In fact, MRS has been operating in Pennsylvania since 2004. The court in *J & M Turner, Inc. v. Applied Bolting Tech., Prods., Inc.,* 1998 WL 47379 *11, 1998 U.S. Dist. LEXIS 1158 *36–37 (E.D.Pa.1998), allowed the issue of lost profits to reach the jury when, *inter alia,* the plaintiff had been in business four months before the injury. As already noted, in November 2004 Xspand initially identified a list of 136 prime school districts that it would target, three of which were crossed-out because they had entered into contracts with MRS. (Doc. 465–14). Since MRS was obviously already in business in November 2004, the harm it claims to have suffered from Xspand's March 1, 2005 letter occurred after it had been in business for in excess of four months. Accordingly, we see no reason to treat MRS' request for lost profits with heightened skepticism.

 Further, Herron has supplied testimony as to the financial performance of MRS over time and MRS has produced its tax returns and profit/loss statements for a number of years. (*See* Doc. 465, App. II, Ex. 8, pp. 225–33). MRS has also supplied a sample of how its damages from lost business opportunities were calculated, which contains figures derived from a percentage of the volume of tax liens which it could have purchased and collected. (*Id.,* App. II, Ex. 94). Xspand does not question the reliability, accuracy, or specificity of these calculations, and so we see no need to do the same. Accordingly, we believe that lost profits can be established to a reasonable degree of certainty. Since we have already determined that a reasonable jury could determine that lost profits were a consequence of the alleged wrong-

ful conduct of Xspand, and because Xspand does not challenge the foreseeability of those damages, we believe that MRS has adduced evidence to defeat summary judgment as to its request for lost profits. Therefore, we will deny the Xspand Motion to this extent.

This concludes our resolution of the Xspand Motion. We shall now proceed to address the merits of the Bear Motion.

### B. The Bear Motion

At the outset, we note that in its motion to dismiss, Bear asserts that MRS is attempting to hold it liable for certain "unpleaded claims." [34] MRS counters that while the amended complaint does not expressly mention illegal campaign contributions, the same is a facet of its unfair competition cause of action and may therefore be properly pursued. We do not agree.

Federal Rule of Civil Procedure 8(a)(2) requires that a complaint contain a short and plain statement of the claim showing that the pleader is entitled to relief, "in order to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 545, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In the case at bar, Plaintiff's amended complaint is utterly bereft of any reference to "illegal campaign contributions" or "Rule G–37 of the MASRB." Accordingly, the amended complaint would not put Defendants on fair notice that Plaintiff's case in any way involved allegations of illegal campaign contributions.[35]

---

**34.** Specifically, Bear contends that throughout the discovery process MRS has maintained a belief that Bear can be held liable for illegal campaign contributions, in violation

Rule G–37 of the Municipal Securities Rulemaking Board ("MSRB"). (Doc. 454 p. 12).

**35.** The closest Plaintiff comes to properly pleading its Rule G–37 allegations are the

Therefore, Plaintiff cannot either maintain a claim for an alleged violation of Rule G-37 or support its unfair competition claim with this theory of liability.[36] To the extent Plaintiff attempts to do so, the Bear Motion is granted.

In addition to the aforementioned argument, the Bear Motion also seeks dismissal of the entire amended complaint against Bear on the basis that MRS lacks grounds upon which to hold it liable. MRS responds that Bear can be properly held liable because it was either in a joint venture or agency relationship with Xspand. We address these contentions in sequence.

### i. Joint Venture

"The Third Circuit has indicated that the essential elements of a joint venture include: (i) a joint proprietary interest in, and a right to mutual control over, the enterprise; (ii) a contribution by each of the parties of capital, materials, services or knowledge; and (iii) a right to participate in the expected profits." *Stecyk v. Bell Helicopter Textron, Inc.*, 1997 WL 701312 (E.D.Pa.1997) (citing *Richardson v. Walsh Const. Co.*, 334 F.2d 334, 336 (3d Cir. 1964)). "Although the existence or nonexistence of a joint venture ... involves a determination of intent, where the essential elements of a joint venture ... are clearly absent, the determination may be made on a motion for summary judgment."

*Combustion Sys. Servs. v. Schuylkill Energy Resources, Inc.*, 1993 WL 514496 *3 (E.D.Pa.1993) (citing *McFadden v. Baltimore Contractors, Inc.*, 609 F.Supp. 1102 (E.D.Pa.1985)).

■ In order to resolve this issue, a brief summary of the organizational structure of Bear may be helpful. Bear is a subsidiary of the Bear Stearns Companies, Inc. ("TBSC"). Declaration of John Garzone ¶ 3.[37] In 2003, Bear contemplated entering into a "strategic alliance" with Plymouth Financial Company, Inc. ("Plymouth Financial") whereby Bear would agree to provide funding to Plymouth Financial who, through its subsidiary, Xspand, would source and service municipal tax liens secured by residential and commercial real estate. *Id.* The terms of the strategic alliance were set forth in a document entitled, "Plymouth Park Tax Services, LLC, Summary of Terms and Conditions, August 12, 2003" (the "Term Sheet"), which called for the creation of an entity, "Plymouth Park Tax Services, LLC" ("Plymouth Park"), which would purchase tax liens and provide financing to Plymouth Financial. *Id.* ¶ 4. The Term Sheet also contemplated that Bear and Plymouth Financial would share joint ownership of Plymouth Park. *Id.* However, as Garzone states, the Term Sheet was never

---

statements contained in paragraph 15 of its amended complaint. That paragraph states, in part, "Defendant ... uses former Governor Florio's political connections to generate business from taxing entities. In addition to utilizing such contacts to 'open doors' to allow Xspand access to government taxing entities ... Florio also uses his political contacts to disparage ... Plaintiff's business." Amend Compl. ¶ 15. However, this paragraph, even if construed liberally, cannot reasonably be said to put Defendants on notice that Plaintiff's case involves, in part, an allegation of illegal campaign contributions.

**36.** If Plaintiff learned of the alleged Rule G-37 violations through the discovery process, it was free to seek inclusion of such allegations in its amended complaint through a properly filed motion to amend that pleading pursuant to Federal Rule of Civil Procedure 15. Unfortunately for Plaintiff, it did not do so. Accordingly, it shall be precluded from lodging these allegations at this late stage of litigation.

**37.** John Garzone ("Garzone") is the former senior managing director of Bear. Garzone Decl. ¶ 1.

implemented. *Id.* 5.[38]

Garzone avers that, instead, TBSC created Plymouth Park as a wholly owned subsidiary, meaning that Bear and Plymouth Park were sister corporations. *Id.* Accordingly, the financing that Plymouth Financial was to receive from Bear under the Term Sheet was now provided by Plymouth Park through an arms-length agreement. *See id.*[39] Plymouth Financial used the financing provided by Plymouth Park to purchase tax liens that were serviced by Xspand. *Id.* ¶ 6. Plymouth Park also purchased tax liens from Plymouth Financial, which were then serviced by Xspand. *Id.* Garzone averred that Plymouth Financial and Plymouth Park maintained separate and independent control over their own expenditures and operations and that Bear never had any ownership interest in Plymouth Park. *Id.* ¶ 7. Finally, Garzone represented that in January 2006 Plymouth Park purchased a significant number of Plymouth Financial's assets, which included some assets of Xspand. *Id.*[40] Although Plymouth Park did not purchase Xspand stock, it acquired the right to use Xspand's name in marketing. *Id.*

At first glance, Garzone's declaration seems to belie MRS' assertion that there was a joint venture between Xspand and Bear because it indicates that in light of the failure to implement the Term Sheet, Bear did not possess any ownership interest in Xspand or had a right to share in Xspand's profits. MRS contests this conclusion and asserts that there is ample record evidence to support a reasonable inference that Bear shared an ownership interest in Xspand and thus in its profits. In support of this, MRS asserts that Bear "jointly marketed" itself with Xspand by placing its logo and name throughout Xspand's marketing materials, (*see e.g.,* Doc. 465 App. II, Exs. 23, 57, 58). MRS contends that Bear received a substantial portion of its tax liens from Xspand, which resulted in a large profit for Bear. Further, MRS points to evidence indicating that Garzone attended marketing meetings with prospective clients where Bear's name and logo were prominently displayed along side the names and logos of both Plymouth Financial and Xspand. (*See id.* App. II, Exs. 58–63). Garzone was also included on emails that contained regular updates of Xspand's marketing efforts. (*See id.* App. II., Exs. 60–63). Further, Scura testified as follows:

Q: ... what would Mr. Garzone have to do with Miss Cerbus' compensation?

A: Well, nothing directly. However, we have an agreement, a *joint venture* agreement, with Bear Stearns whereby outside consulting expenses are deducted from the profitability of a transaction. So to the

---

**38.** A provision of the Term Sheet specifically establishes:

Except with the confidentiality provision contained herein, *this Summary of Terms is not intended to constitute a legally binding agreement* ... and does not contain all of the detailed terms which will be included in the definitive agreements. *A binding obligation will come into existence only upon the execution of the definitive agreements.* (Doc. 454, Ex. 1, at Ex. A, p. 19) (emphasis added). Accordingly, since the Term Sheet was never implemented, by its own language

it did not create binding obligations between Bear and Plymouth Financial.

**39.** Although Bear indicates that the agreement between Plymouth Park and Plymouth Financial as Exhibit B to Exhibit 1 of document 454, that document unfortunately is absent.

**40.** Documents supplementing the asset purchase agreement indicate that Garzone was the President of Plymouth Park. (Doc. 454–2, pp. 36–40).

extent that she functioned as a consultant on a specific transaction, the amount of money that we paid her would have a direct impact on the profitability of that transaction and, therefore, he should have input into the decision.

Scura Dep. 5:20–6:7 (emphasis added). Despite the structure of, and transactions involving, Bear outlined hereinabove, we believe that the evidence cited in this paragraph could reasonably lead a jury to conclude that Bear was involved in a joint venture with Xspand and is therefore jointly and severally liable for Xspand's marketing statements. *See Sleasman v. Brooks*, 1984 WL 2248 *3–4 (Pa.Com.Pl. 1984) ("Partners and members of a joint enterprise or joint venture are jointly and severally liable in tort."). Vigorously as Bear may argue otherwise, it is possible that it did not fully remove itself from Xspand's operation despite the structural machinations as noted. Accordingly, we will deny the Bear Motion to this extent. Having resolved the Bear Motion in its entirety, we shall proceed to address the MRS Motion.

## C. The MRS Motion

The MRS Motion is premised on two arguments. First, MRS contends that it is entitled to summary judgment to the extent that certain aspects in Xspand's March 1, 2005 letter and in its FAQ were "literally false." Second, MRS argues that the Tax Injunction Act ("TIA"), 28 U.S.C. § 1341, prevents Xspand from asking this Court to find that the school districts that engaged in MRS-facilitated transactions and booked the proceeds therefrom as revenue were, as a matter of fact, wrong in doing so. We address these issues *ad seriatim.*

### i. Literal Falsity Argument

As we already stated in our discussion of the Xspand Motion, the statements related to MRS contained in Xspand's March 1, 2005 letter were incapable of being "literally false" because they were ambiguous. *Novartis Consumer Health, Inc. v. Johnson & Johnsons–Merck Consumer Pharms. Co.*, 290 F.3d 578, 586 (3d Cir. 2002); *see also Schering–Plough Healthcare Prods. v. Neutrogena Corp.*, 2010 WL 960635 *3 (D.Del.2010). Accordingly, we will deny the MRS Motion to this extent.[41] Since we have not previously addressed literal falsity as it pertains to the FAQ, we shall do so now.

Paragraph 18 of the FAQ states as follows:

**18. Is the XSPAND program the same program that the Harrisburg School District is participating in?**

The Harrisburg School District is currently participating in a borrowing plan associated with a loan from Commerce Bank.[42] This plan has recourse to the Harrisburg School District if the liens are not sufficient to repay the borrowing. *The liability appears on the balance sheet of the Harrisburg School District,* and the advance of the borrowed funds is not revenue for budgeting purposes. The debt 'does' affect the School Districts credit rating, and may be limited by any debt limitation tests in bond indentures.

---

**41.** Here again, we note that while Xspand's representation regarding a business relationship with the city of Allentown was literally false, the same cannot support any of the claims in the complaint because MRS has not established causation as to it. Accordingly, we need not address it any further in the present context.

**42.** This statement indicates that the transaction in question was facilitated by MRS, as it used Commerce Bank to finance its transaction with the Harrisburg School District.

(Doc. 465–10, Ex. 5) (emphasis added). We believe that the above-emphasized language is unambiguous; a reasonable person could only read it to mean that the Harrisburg School District *actually booked* the MRS-facilitated transaction as a borrowing that created debt, not revenue. Contrary to that statement, the Harrisburg School District *actually booked* the proceeds of the MRS-facilitated transaction as revenue, not debt. In its opposition to the MRS Motion, Xspand admits that the above-emphasized statement is incorrect but asserts that it is a mere "typographical error"[43] that is of "no moment."

█ In support of this contention, Xspand states that to obtain monetary damages in a § 43(a) Lanham Act false advertising case, a plaintiff seeking such damages must prove actual consumer deception, even if the claim is based on "literal falsity."[44] We believe that this is an accurate statement of the law. *See Gallup, Inc. v. Talentpoint, Inc.,* 2001 WL 1450592 *13 (E.D.Pa.2001) (emphasis added) ("Where plaintiff seeks *injunctive relief,* and shows that a claim is literally false, a court need not consider whether the public is misled. Where, however, a plaintiff seeks *monetary damages,* proof of actual deception is required. This does not mean that plaintiff bears the burden of

detailing individualized loss of sales; however, plaintiff must show some customer reliance on the false advertising."); *see also Castrol Inc. v. Pennzoil Co.,* 987 F.2d 939, 941–43 (3d Cir.1993) (affirming trial court decision to grant injunctive relief but deny monetary relief in spite of finding literal falsity); *Parkway Baking Co. v. Freihofer Baking Co.,* 255 F.2d 641, 649 (3d Cir.1958) ("In cases of injunction ... there seems to be no requirement that purchasers actually be deceived, but only that the false advertisements have a tendency to deceive.... While it would be going too far to read the requirement of customer reliance out of this section so far as damages are concerned, we believe that this is a recognition that, as with most equitable relief by way of injunction, Section 43(a) may be asserted upon a showing of likelihood of damage without awaiting the actuality."); *Bracco Diagnostics, Inc. v. Amersham Health, Inc.,* 627 F.Supp.2d 384, 482 (D.N.J.2009) (for the proposition that "literal falsity, without more, is insufficient to support an award of money damages to compensate for marketplace injury);" *Synygy, Inc. v. Scott–Levin, Inc.,* 51 F.Supp.2d 570, 575 (E.D.Pa.1999) ("Thus, a plaintiff seeking monetary rather than injunctive relief must show actual damages rather than a mere tendency to be dam-

---

**43.** Xspand asserts that the statement was intended to read "The liability *should* appear on the balance sheet ..." (Doc. 472 p. 12). This supposed "typographical error" does not implicate a misspelling or a transposition of words; it involves the complete omission of a word that substantially changes the meaning of the declaration. Given the allegations made by MRS, we believe that the jury is entitled to determine the nature of the error contained in the FAQ.

**44.** Xspand asserts that MRS can only seek money damages because Xspand has stopped circulating the advertisements in question, meaning there is no basis for an injunction. MRS, on the other hand, asserts that even if

Xspand has stopped misrepresenting the nature of MRS-facilitated transactions, that does not moot the need for injunctive relief. It contends that since the effect of Xspand's marketing statements lasted for years, it is entitled to a court-ordered state-wide retraction of Xspand's false statements, even at this late date, which is approximately 5 years after Xspand's marketing campaign commenced. Neither party has cited any authority regarding the appropriateness, or lack thereof, of the contemplated injunctive relief, and Xspand has not explicitly requested summary judgment on this issue. It is accordingly unnecessary to discourse further about it within our analysis.

aged.").[45] Xspand contends that since MRS cannot establish actual consumer deception, the misstatement contained in the FAQ is of no moment.

■ On the point of actual deception, we note that Marie Guidry, a representative from the East Stroudsburg School District, testified:

Q: Based on [paragraph 18 of the FAQ] ... is Xspand leading you to believe that the MRS transaction does not produce revenue for budgeting purposes?

A: Correct.

Q: And is Xspand leading you to believe that the debt incurred as a result of the MRS transaction would affect the school district's credit rating?

A: Yes.

Q: An is Xspand also leading you to believe that any affect on such cred-

it rating may be limited by any debt limitation test in bond indentures?

A: Yes.

Q: And does this paragraph echo the concerns you had about the affect on the school district's bond rating?

A: Yes.

Marie S. Guidry Dep., January 4, 2006, 64:17–65:3. Based on this testimony, we believe that a reasonable jury could determine that the literally false statement in Xspand's FAQ document actually deceived Guidry. However, this does not conclusively establish MRS' right to relief, as MRS must also establish causation. On this point we note that while Herron testified that representatives from East Stroudsburg confirmed that Xspand's marketing materials caused that school district not to do business with MRS, Guidry's deposition testimony provides reasons to believe that the Xspand marketing materials had no effect on East Stroudsburg's

---

**45.** MRS challenges this statement of law on several fronts. First, it cites *Facenda v. NFL Films, Inc.*, 542 F.3d 1007 (3d Cir.2008), and *Santana Prods.*, 401 F.3d at 136, for the proposition that proof of actual deception is not necessary in a § 43(a)(1)(B) Lanham Act false advertising claim when plaintiff proves literal falsity. However, this statement in *Facenda* arose in *dicta*, as that case actually involved a § 43(a)(1)(A) Lanham Act false-endorsement claim. Indeed, the Third Circuit admitted that the standards governing § 43(a)(1)(B) and § 43(a)(1)(A) are often different. *See Facenda*, 542 F.3d at 1021. Further, the relevant portion of *Facenda* quotes *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 472 n. 8 (3d Cir.1994). In footnote 8, the *Fisons* Court cited to *Johnson & Johnson–Merck Consumer Pharms. Co. v. Rhone–Poulenc Rorer Pharms., Inc.*, 19 F.3d 125 (3d Cir.1994), and *Sandoz Pharm. Corp. v. Richardson–Vicks, Inc.*, 902 F.2d 222 (3d Cir. 1990), both of which involved injunctions. Additionally, the proposition as it is found in *Santana Products* is accompanied by a citation to *Johnson & Johnson.* Accordingly, MRS' citation to *Facenda* and *Santana Prod-*

*ucts* does not alter our opinion that it must establish actual deception to succeed on its § 43(a)(1)(B) Lanham Act false advertising claim.

Second, MRS cites various cases from foreign jurisdictions for the proposition that where there is willfully false advertising, as is purportedly the situation in the case at bar, there is a presumption of damages. *See Porous Media Corp. v. Pall Corp.*, 110 F.3d 1329, 1336 (8th Cir.1997); *Trilink Saw Chain, LLC v. Blount, Inc.*, 583 F.Supp.2d 1293, 1320–21 (N.D.Ga.2008); *Heidi Ott A.G. v. Target Corp.*, 153 F.Supp.2d 1055, 1072 (D.Minn.2001). Notably, MRS has failed to cite any authority in our Circuit for this proposition. Further, to the extent that this proposition is interposed as an attempt to establish that proof of actual customer deception occurred, such a contention squarely conflicts with the above-cited Third Circuit authority establishing that plaintiffs must prove actual customer confusion/deception in order to recover money damages for a Lanham Act false advertising claim. Therefore, we find Plaintiff's argument on this point unavailing.

decision not to contract with MRS. Indeed, Guidry claimed that Xspand's FAQ document "echoed" concerns she *already harbored* regarding the effect that tax lien sales to private entities would have on the school district's financial statements and bond rating. *See* Guidry Dep. 43:5–44:1, 64:17–65:3. Accordingly, we believe that a reasonable jury could determine that the Xspand marketing materials did not play a causal role in East Stroudsburg's decision not to contract with MRS. Consequently, we are of the opinion that the issue of causation is a determination to be made by the jury. Therefore, we will grant the MRS Motion insofar as it requests a declaration that Xspand's representation regarding its business relationship with the city of Allentown and Xspand's statement in the FAQ document to the effect that the Harrisburg School District booked the proceeds of MRS-facilitated transactions as debt are literally false. However, we will deny the MRS Motion to the extent it seeks to impose liability based on either of these literal falsities, and to the additional extent that it seeks a determination that any other Xspand marketing statements were literally false. We now proceed to the TIA argument.

### ii. TIA Argument

The TIA states, "The district court shall not enjoin, suspend, or restrain the assessment, levy, or collection of any tax under state law where a plain, speedy, and efficient remedy can be had in the courts of such state." 28 U.S.C. § 1341. In this regard, MRS notes, "A lien sale is a mode of tax collection; and so an action to enjoin it, or declare it illegal, or rescind it ... would be barred by the [TIA] or, in the case of the damages suit, by the freestanding principle of comity." *Wright v. Pappas*, 256 F.3d 635, 637 (7th Cir.2001) (citing *Simon v. Cebrick*, 53 F.3d 17, 22 (3d Cir.1995)). MRS contends that the TIA is

applicable in the case at bar because Xspand is asking the Court to second guess the decisions of local elected officials as to what has been treated as revenue since the moment the liens were sold. Essentially, then, MRS claims that Xspand requests us to act as a "super auditor" over state and local governmental entities in a way that would usurp the powers of the Pennsylvania Department of Community and Economic Development (the "DCED") and the Pennsylvania Auditor General. Further, MRS asserts that Xspand had state remedies for challenging whether it improperly classified a transaction as a sale instead of a borrowing. *See* 53 Pa.C.S. § 8211(d) (cited for the proposition that the DCED has exclusive jurisdiction to determine all procedural and substantive matters arising out of transactions engaged in by local government unites which create debt for those entities).

While exceedingly novel, we find Plaintiff's argument unpersuasive. The United States Supreme Court has stated, "The TIA's legislative history shows that, in enacting the statute, Congress focused on taxpayers who sought to avoid paying their state tax bill by pursuing a challenge route other than the one specified by the taxing authority." *Hibbs v. Winn*, 542 U.S. 88, 89, 124 S.Ct. 2276, 159 L.Ed.2d 172 (2004). Accordingly, the Court proceeded to state that it "has interpreted and applied the TIA only in cases Congress wrote the statute to address, *i.e.*, cases in which state taxpayers seek federal-court orders enabling them to avoid paying state taxes." *Id.* at 89, 124 S.Ct. 2276. Indeed, the case cited by MRS in support of its position is consistent with this construction of the TIA in that *Wright* involved a plaintiff who bought tax liens from Cook County, Illinois and later sued the treasurer on the theory that the treasurer overstated the value of the liens based on plaintiff's race. *Wright*

challenged the collection of taxes and requested a refund from the county, thereby attempting to avoid the payment of taxes. These circumstances quite obviously differ greatly from the facts present in the case *sub judice.*

Unlike the plaintiff in *Wright,* no party in the case at bar is requesting the government to take any action. Xspand is merely attempting to establish that certain government entities erroneously booked the proceeds of MRS-facilitated transactions as revenue instead of properly booking them as debt. While this involves the government in a tangential way, Xspand is not attempting to force the government to retroactively alter its accounting books. Further, even if a jury finds Xspand's argument persuasive, the government entities that booked MRS-facilitated proceeds as revenue will not be compelled to adjust their books to reflect that the MRS-facilitated transaction produced debt. Indeed, it appears that any decision made by this Court will not affect the balance sheets or budgets of any of the local government entities implicated in this case. No transfer of funds from the local government entities to MRS or from MRS to the local government entities that was not contemplated by the terms of the MRS-government contract will occur as a result of any decision that may be rendered in this case. At most, a decision adverse to MRS will merely indicate that the government entities booking the proceeds of MRS-facilitated transactions as revenue may have committed an error in book keeping; it will not change the capital at the governmental entity's disposal. Accordingly, we do not believe that the TIA is applicable to this case because we cannot perceive how any activity in this case will "enjoin, suspend, or restrain the assessment, levy, or collection" of any state tax. Therefore, we will deny the MRS Motion to this extent.

## V. CONCLUSION

For the foregoing reasons, and to the extent reflected above, we shall deny in part and grant in part the Xspand Motion, the Bear Motion, and the MRS Motion. We shall also deny Xspand's motion in limine seeking the exclusion of Herron's expert testimony with leave to re-file the same within 30 days of receipt of the transcript from Herron's "expert" deposition.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1. Xspand's motion in limine seeking the exclusion of Herron's expert testimony (Doc. 441) is **DENIED** without prejudice to re-file within 30 days of receipt of the transcript from Herron's "expert" deposition.

2. Xspand's Motion for Summary Judgment (Doc. 445) is **GRANTED IN PART** and **DENIED IN PART** to the following extent:

 a. The Motion is **DENIED** insofar as it involves the following:

 i. Xspand's global *Noerr Pennington* argument;

 ii. Xspand's global falsity argument;

 iii. Xspand's global causation argument;

 iv. MRS' commercial disparagement claim;

 v. MRS' tortious interference claim; and

 vi. MRS' request for lost profits.

 b. The Motion is **GRANTED** insofar as it involves MRS' defamation claim and MRS' Commerce Bank argument.

3. MRS' Motion for Partial Summary Judgment (Doc. 449) is **GRANTED IN PART** and **DENIED IN PART** to the following extent:

a. The Motion is **GRANTED** insofar as it requests a declaration that the following statements are literally false: (i) Xspand's representation regarding its business relationship with the city of Allentown; and (ii) Xspand's statement in the FAQ document to the effect that the Harrisburg School District booked the proceeds of MRS-facilitated transactions as debt.

b. The Motion is **DENIED** insofar as MRS requests a judgment of liability based on the aforementioned literal falsities.

c. The Motion is **DENIED** insofar as it requests a declaration that any additional Xspand marketing statements were literally false.

4. Bear's Motion for Summary Judgment (Doc. 451) is **GRANTED IN PART** and **DENIED IN PART** to the following extent:

a. The Motion is **GRANTED** insofar as it involves MRS' unpleaded Rule G–37 averments.

b. The Motion is **DENIED** insofar as it involves Bear's liability for Xspand's marketing activities.